UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JTH TAX LLC d/b/a Liberty Tax
Service,

          Plaintiff,

    v.

LESLIE N. PIERCE, JAMES E.
AXLEY, LNPA SERVICES LLC, AX
HOLDINGS INC., and NEST
FINANCIAL SERVICES LLC,

          Defendants.

CIVIL ACTION NO.

1:22-CV-1237-SEG

## OPINION AND ORDER

This matter is before the Court on Defendants' Partial Motion to Dismiss pursuant to Rule 12(b)(6) (Doc. 31), as well as their earlier Emergency Motion to Dismiss pursuant to Rule 12(b)(1) (Doc. 14). The latter motion was held in abeyance by the Court's April 29 Order (Doc. 25) pending Plaintiff's filing of an amended complaint that addressed the jurisdictional deficiencies in the original. Plaintiff timely filed its First Amended Verified Complaint (Doc. 29), which is now the operative pleading in the case, and the one at which the Rule 12(b)(6) motion is directed. Both Rule 12 motions are fully briefed.[1]

---

[1] In general, Rule 12(g) requires that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Rule 12(h)(2) does not except Rule 12(b)(6) defenses

The Court finds that it has subject-matter jurisdiction to hear this case, and it will therefore **DENY AS MOOT** Defendants' Rule 12(b)(1) motion (Doc. 14). Defendants' Rule 12(b)(6) motion is due to be **GRANTED IN PART AND DENIED IN PART**. For the reasons discussed below, the Court will dismiss Plaintiff's claim for tortious interference with a contract, but it finds that Plaintiff has adequately pled the remainder of the challenged claims. Plaintiff will, however, face difficulty in securing all the relief it seeks, as its prayer for an injunction against Defendants' competing business is likely barred by Georgia choice of law rules and related state law governing the enforcement of covenants not to compete.

---

from the general prohibition against successive Rule 12 motions. *See Brooks v. Warden*, 706 F. App'x 965, 968 (11th Cir. 2017) (citing *Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1106 (9th Cir. 2000)). Instead, Rule 12(h)(2) allows 12(b)(6) defenses to be raised in an answer (under Rule 7(a)), in a post-answer motion for judgment on the pleadings (under Rule 12(c)), or at trial. But such defenses generally may not be the subject of successive motions to dismiss. *See id.*

Here, however, the Court will consider the arguments in Defendants' second motion to dismiss on the basis that (1) Plaintiff has not contested them under Rule 12(g), and (2) the successive motions "do not appear to have been filed for any strategically abusive purpose." *In re Apple iPhone Antitrust Litigation*, 846 F.3d 313, 320 (9th Cir. 2017); *see also id.* at 318-19 (adopting the view that Rule 12(g)(2) generally bars litigants from raising new arguments in successive motions to dismiss, but that courts should not mechanically apply the rule where doing so would "produce unnecessary and costly delays, contrary to the direction of Rule 1").

## I.     Jurisdiction

Where courts have both jurisdictional issues and a 12(b)(6) motion before them, they are obliged to consider the jurisdictional issues first.  *See Harris v. Bd. of Trustees Univ. of Alabama*, 846 F. Supp. 2d 1223, 1229 (N.D. Ala. 2012); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).   Defendants' Emergency Motion to Dismiss (Doc. 14) argued that Plaintiff's original pleading failed, on its face, to allege facts showing that this Court had subject matter jurisdiction over the present case.  The Court agreed that Plaintiff had not adequately alleged the citizenship of the members of the various intermediate limited liability companies in its ownership structure, which left the Court unsure about its diversity jurisdiction under 28 U.S.C. § 1332.  (Doc. 27 at 5-8.)  The Court also agreed that Plaintiff had not adequately alleged federal-question jurisdiction based on its federal Defend Trade Secrets Act claim.  (*Id.* at 8-10.)  The allegations did not persuade the Court that one component of the statute—that "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce"—had been satisfied.  18 U.S.C. § 1836(b)(1).  This is the only federal law claim that Plaintiff brings, so if it were subject to dismissal and diversity jurisdiction were lacking, the Court would have no power to hear this case.  The Court granted

Plaintiff leave to amend its pleading to address these deficiencies, and it held the motion to dismiss in abeyance pending the filing of the amendment.

Plaintiff's amended complaint cures the deficiencies of its original pleading pertaining to the Court's subject matter jurisdiction.  The Court is now assured that it has jurisdiction to hear the case under 28 U.S.C. § 1332. Plaintiff has adequately alleged that the amount in controversy exceeds $75,000.  (Doc. 29 at 3, ¶ 8.)  And Plaintiff has now adequately alleged the citizenship of each member of each of the LLCs in its ownership structure, none of whom is a citizen of Georgia.  (Each of the LLCs has another Delaware LLC as its sole member, except for the final LLC in the chain, whose sole member is NextPoint Financial, Inc., a corporation organized under the laws of Canada with its principal place of business in Texas.)  (Doc. 29 at 1-2, ¶ 1.)  *See Mallory v. Evans Contractors & Eng'rs, LLC v. Tuskegee Univ.*, 663 F.3d 1304, 1305 (11th Cir. 2011) (holding that, to sufficiently allege the LLC's citizenship, plaintiff was required to list the "citizenships of all the members of the limited liability company"); *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (holding that corporations are domiciled in their state of incorporation and in the state where they have their principal place of business or "nerve center").  Along with the undisputed allegations that each of the Defendants—corporate, LLC, and individual—is a citizen only of Georgia for the purpose of diversity jurisdiction,

there is complete diversity among the parties in this case.  *See Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1261 (11th Cir. 2000).   Defendants' Emergency Motion to Dismiss will therefore be denied as moot.[2]

Because the Court has subject matter jurisdiction under 28 U.S.C. § 1332, there is no reason for it to consider whether Plaintiff has sufficiently alleged its federal Defend Trade Secrets Act claim under Rule 12(b)(1).   As noted above, the Court previously found that Plaintiff had narrowly failed to allege the requisite connection between the alleged trade secret and "a product or service used in . . .  interstate or foreign commerce," and it gave Plaintiff leave to re-plead.  (Doc. 27 at 8-10.)  Plaintiff did so, and Defendants have not raised any arguments regarding the DTSA claims in their second motion to dismiss, which is the only motion properly directed at the First Amended Verified Complaint.

## II.    Rule 12(b)(6) Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

---

[2] The Court denies the motion as moot because it was directed at the original complaint, which has since been superseded by the First Amended Verified Complaint.

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief." *Id.* (citing *Twombly*, 550 U.S. at 557).  The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of a cause of action's elements."  It must allege facts that "raise the right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).  In general, courts ruling on Rule 12(b)(6) motions to dismiss are confined to the pleading.  If they wish to consider extrinsic evidentiary material, Rule 12(d) compels them to convert the motion into a Rule 56 motion for summary judgment and to provide the parties with a "reasonable opportunity" to present additional relevant material.  *See* Fed. R. Civ. P. 12(d).

6

Courts may, however, consider certain "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" in connection with a Rule 12(b)(6) motion, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), without converting the motion. *See* Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1366 (3d ed.). Where, for example, a contract attached as an exhibit to the pleading is central to the complaint and of undisputed authenticity, the Court may consider it in deciding a Rule 12(b)(6) motion. *See Homart Development Co. v. Sigman*, 868 F.2d 1556, 1561 (11th Cir. 1989) ("[I]n a specific performance action based on a contract to convey land, the contract, itself, is part of the pleadings."); *Moore v. McCalla Raymer*, LLC, 916 F. Supp. 2d 1332, 1336 n.1 (N.D. Ga. 2013); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition to the franchise agreement, the 2013 amendment, and copies of certain correspondence attached as exhibits to the Complaint, various other pieces of extrinsic evidence were introduced into the record by both parties in connection with the separate briefing of Plaintiff's Motion for a Preliminary Injunction (Docs. 2, 13, 15). At points, both parties cite to this evidence in their briefings on the partial motion to dismiss. The Court, however, "has discretion to determine whether to accept documents beyond the pleadings" in deciding a

Rule 12(b)(6) motion, *Moore*, 916 F. Supp. 2d at 1336 n.1, and in this case it finds it unnecessary to do so, given that the existing record "would serve as incomplete support for ruling on the merits of this case." *See Mize v. 300 "F" Street, Inc.*, No. 2:21-cv-38, 2021 WL 5494790, at *2 (S.D. Ga. Oct. 13, 2021). The Court draws the facts from the pleading and the exhibits attached to the First Amended Verified Complaint.

Because of the 12(b)(6) standard of review and the more limited evidentiary material it will take into account, the version of the facts drawn from here may differ slightly from that developed in the Court's Order denying Plaintiff's Motion for a Preliminary Injunction (Doc. 38), where the Court took additional evidence into account and was not required to make inferences in favor of the Plaintiff. *See Imaging Bus. Machines, LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006).

## III.   Background

The parties' dispute arises out of a franchise relationship. Plaintiff JTH Tax LLC does business as Liberty Tax Service, a national tax preparation chain. Defendants Pierce and Axley are former Liberty franchisees domiciled in Georgia. They operated a Liberty Tax franchise in Roswell, Georgia, for approximately seven years beginning in October 2012, first as direct signatories to a franchise agreement and later, after the agreement was

amended in 2013 to name LNPA Services LLC as the franchisee, as guarantors. Today Pierce and Axley own and operate a tax preparation and financial services business called Nest Financial. Nest Financial is located in Roswell, Georgia—Plaintiff alleges it is located six miles from the prior Liberty Tax location—and is organized as Nest Financial Services LLC. The LLC's sole member is AX Holdings Inc., a Georgia corporation whose sole shareholders are Axley and Pierce. AX Holdings is also the sole member of LNPA Services LLC. Pierce is the CFO and Secretary of AX Holdings Inc., and Axley is its CEO and registered agent.

The franchise agreement contains a noncompete covenant purporting to bind the franchisee "not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns, or offer Financial Products, within the [franchise] Territory or within twenty-five (25) miles of the boundaries of the Territory," both during the term of the agreement and "[f]or a period of two (2) years following the termination, expiration, transfer or other disposition of the Franchised Business, or your removal as a Signator to this agreement[.]" (Doc. 29-1 at 16). It contains a series of other "post termination obligations," including obligations to stop identifying oneself as a current or former Liberty Tax franchisee, to return Liberty's confidential materials and operations

manual, to return customer records, and to pay any amounts owing to Liberty. (*Id.*)

The agreement also contains a termination clause providing for its expiration after five years.  (*Id.* at 5, 14.)  It is not alleged that the franchise agreement was formally renewed by either party, so the written franchise agreement expired by its terms on October 31, 2017.[3]  Although the written agreement was not renewed, the parties continued to deal on what they call an "at will" basis "consistent with the previous performance under the Franchise Agreement."  (Doc. 33 at 3.)

In mid-January 2020, Plaintiff sent Defendants a number of "notice to cure default" letters alleging that Pierce and Axley had failed to make payments owed to Liberty and to file various required reports about their franchise.  On May 15, 2020, Plaintiff sent Defendants a letter purporting to terminate the franchise agreement.  Plaintiff alleges that at the time of

---

[3] Although Plaintiff's First Amended Verified Complaint does not allege that the written agreement expired in 2017, it does incorporate the contract, and "[w]here exhibits are submitted that contradict the alleged facts, the exhibits control, despite our construction of facts in favor of their truth."  *Celestine v. Capital One*, 741 F. App'x 712, 713 (11th Cir. 2018) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)).  Plaintiff also concedes in its Response that the contract "expired by its terms on October 31, 2017."  (Doc. 32 at 3.)

termination, Pierce, Axley, and LNPA Services owed $12,855.12 in past due accounts and failed to return certain materials containing confidential information to Liberty.[4]

Plaintiff brings claims on the franchise agreement for equitable relief (Count I) and monetary relief (Count II), a federal law claim under the Defend Trade Secrets Act (DTSA) (Count III), and common law claims for conversion (Count IV) and tortious interference with a contract (Count V). Counts I, II, and IV are directed at Pierce, Axley, and LNPA Services; Count III is directed at all of the defendants; and Count V is directed at Nest Financial Services LLC and AX Holdings Inc.

## IV. Discussion

### a. Choice of Law

#### i. The Contract Claims

"In a case founded on diversity jurisdiction, the district court must apply the forum state's choice of law rules." *Federated Rural Elec. Ins. Exch. v. R. D.*

---

[4] The only specifically identified materials are those in the Liberty Operations Manual, which Defendants' counsel returned to Plaintiff at this Court's June 29 hearing on Plaintiff's Motion for a Preliminary Injunction. As the Court noted in its July 1 Order, it is unclear whether there are other hard-copy materials that Plaintiff claims remain in Defendants' possession, although the First Amended Verified Complaint does seem to allege this. (Doc. 38 at 18, n.6.)

*Moody & Assocs., Inc.*, 468 F.3d 1322, 1325 (11th Cir. 2006); *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Such rules include the forum state's approach to enforcing contractual choice of law provisions.  *See, e.g., Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1297 (11th Cir. 2003) (certifying a question regarding construction and effect of a choice of law clause to the state supreme court of the district court's forum state).

Paragraph 17(a) of the franchise agreement is a broadly written choice of law clause stating that "Virginia law governs all claims which in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto."  (Doc. 29-1, at 21.)  Under Georgia law, "parties by contract may stipulate that the laws of another jurisdiction will govern the transaction," and such contractual choice of law clauses will be enforced "in the absence of contrary public policy."  *Manderson & Assocs., Inc. v. Gore*, 389 S.E.2d 251, 254 (Ga. Ct. App. 1989); *see also Carr v. Kupfer*, 296 S.E.2d 560, 562 (Ga. 1982).  So far the parties have not argued that applying Virginia law would contravene Georgia public policy, and Court will therefore apply Virginia law in its interpretation of the contract at this stage of the case.

## ii.    The Tort Claims

A second issue, also not discussed by the parties, is whether the contractual choice of law provision can or should be read to apply Virginia law to Plaintiff's tort claims, namely conversion and tortious interference with a contract. Both parties cite Georgia law with respect to the tort claims, so the Court deems them to have waived any argument that the law of another jurisdiction should govern them for the purposes of this motion. *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) ("[B]ecause the parties failed to consider the choice of law in this diversity case, we must presume that the substantive law of the forum . . . controls.").

### iii.   Georgia's Public Policy Exception

The Court notes that future briefing will require a closer attention to the relevant choice of law issues, which may bear significantly on the disposition of this case. Georgia's approach to enforcing contractual choice of law clauses is, as noted above, subject to a strong public policy exception: Georgia courts "will not" enforce choice of law clauses when "application of the chosen law would contravene the policy of, or would be prejudicial to the interests of, this state." *Nasco, Inc. v. Gimbert*, 238 S.E.2d 368, 369 (Ga. 1977). Georgia courts have also been clear that "covenants against competition . . . affect the interests of this state . . . and hence their validity is determined by the public policy of this state." *Id.* Accordingly, foreign law cannot be selected to enforce a

covenant not to compete in a way that would be impermissible under Georgia law, for doing so would violate Georgia public policy. *See id.*; *Convergys Corp. v. Keener*, 582 S.E.2d 84, 85-86 (Ga. 2003) (reaffirming *Nasco* on question certified from the Eleventh Circuit); *Boone v. Corestaff Support Servs., Inc.*, 805 F. Supp. 2d 1362 (N.D. Ga. 2011) (Story, J.) ("If a restrictive covenant is not enforceable under Georgia law, it is violative of Georgia's public policy and a choice-of-law provision choosing the law of a foreign jurisdiction may not be applied to enforce the covenant.") (citing *Convergys Corp.*, 582 S.E.2d at 85-86).

It will be up to the parties to argue, at a later stage, whether a conflict between Virginia and Georgia law exists regarding the noncompete covenant or any other issue that might implicate Georgia public policy. However, at least some apparent conflicts are already visible. Georgia courts have, for example, repeatedly refused to enforce restrictive covenants that have expired by their own terms, even if the expiration was due to delays from litigation or other factors beyond the plaintiff's control. *See Coffee Sys. of Atlanta v. Fox*, 182 S.E.2d 109 (Ga. 1971) ("[S]uch an extension would in effect rewrite the one-year feature of the agreement. Courts do not make contracts for the parties. The contingency of litigation could have been provided for in the agreement, but was not."); *Elec. Data Sys. Corp. v. Heinemann*, 493 S.E.2d 132

(Ga. 1997) (expressly affirming Coffee Sys. of Atlanta on this point and rejecting invitation to overrule it); *Bearoff v. Craton*, 830 S.E.2d 362, 371 (Ga. Ct. App. 2019) ("[T]he Supreme Court of Georgia has rejected—at least implicitly—the idea that equity permits a court to extend the period of a non-compete agreement.").  Virginia law, by contrast, permits such relief under limited circumstances.  *See, e.g., Roanoke Engineering Sales Co. v. Rosenbaum*, 290 S.E.2d 882 (Va. 1982) (granting thirty-month injunction to a party whose three-year restrictive covenant had expired, on its own terms, about a year before the Court decided the case).[5]  In this case, Plaintiff prays for an injunction preventing Defendants "from offering tax preparation services within 25 miles of their former Liberty franchise territory for a period of two years following the entry of any injunction."  (Doc. 29 at 21.)  But even on Plaintiff's own dating of the termination of the franchise agreement, the two-year noncompete period expired in May 2022, shortly after the case was filed. At least one potential conflict of laws exists because it appears that, under these circumstances, Georgia law would not permit a prospective injunction to issue, while Virginia law might.

---

[5] However, the Supreme Court of Virginia was clear that a prospective, post-expiration injunction was appropriate only insofar as the delay in litigating the issue was not of the Plaintiff's own making.  *See id.* at 885-86.

The Court raises these issues here to encourage the efficient litigation of this dispute going forward.  In the final analysis the Court will be bound to enforce Georgia choice of law rules—including its public policy exception to enforcing contractual choice of law clauses—regardless of whether the parties squarely address them.  *See Klaxon Co.*, 313 U.S. at 496; *Federated Rural Elec. Ins. Exch.*, 468 F.3d at 1325 ("[A] federal district court sitting in diversity *must* apply the choice of law rules of the forum state.") (emphasis added).

### b. Breach of Contract

### i.   Breach of Contract Claims as to LNPA Services

The essence of Defendants' position in their Partial Motion to Dismiss is that the franchise agreement "expired on October 31, 2017" and was not renewed. Therefore, they argue, none of the agreement's in-term provisions continued in force beyond that date, and none of the post-term covenants had any force after October 31, 2019, two years after the expiration.  (Doc. 31 at 9.) If the Court accepted this view of the agreement, none of the facts that Plaintiff alleges amount to breaches could be legally cognizable as such.[6]

---

[6] It is unclear why Defendants only move to dismiss the breach of contract claim for equitable relief (Count I) but not the money damages contract claim (Count II), since, if accepted, their theory would support dismissal of both claims.

Plaintiff, for its part, maintains that the franchise agreement "was not terminated until May 15, 2020." (Doc. 32 at 11.) Plaintiff does not dispute Defendants' claim that the original agreement was not renewed in accordance with its terms before October 31, 2017. (Doc. 32 at 3.) Instead, it alleges that Defendants continued to operate a Liberty Tax franchise after October 31, 2017, and that therefore "the terms of the Franchise Agreement continued in place for several years beyond the expiration date" under an implied-in-fact agreement between the parties. (Doc. 32 at 11.)

In their Reply, Defendants do not dispute "the general proposition that parties may continue their relationship under an expired contract." (Doc. 33 at 5, n.1.) But they do argue that the plain language of their written contract with Plaintiff precluded the post-term covenants from being incorporated into any future implied agreement between the parties. That term, they say, is clearly pegged to the expiration of the express franchise agreement, and the Court may not rewrite the contract so as to extend it beyond that term.

In addressing these arguments, a good place to begin is with the observation that both parties agree that the franchise agreement's termination and renewal clauses mean what they say. Clause 2(a) states that the franchise agreement will be "effective for a five-year term beginning on the Effective Date specified in [the] Agreement" while clause 8(a) provides that Defendants

could terminate the Agreement by, *inter alia*, "not renewing" before the end of the five-year period.  (Doc. 29-1 at 5, 14.)  The "Effective Date" of the agreement is October 31, 2012.  (*Id.* at 24.)

But contrary to the position advanced by Defendants, these facts provide only the starting point, not the conclusion, of the legal analysis.  The question this analysis will eventually have to answer is what the nature of the parties' legal relationship was after October 31, 2017.  At this stage, however, the Court must only decide whether the fact of the franchise agreement's expiration on that date makes it impossible for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)—whether, in other words, none of the claimed breaches could have plausibly occurred because the parties were no longer obligated to one another.

Defendants have not made such a showing.  On the contrary, Plaintiff has pled facts that, taken as true, would allow the Court to draw the reasonable inference that the parties were bound by an implied contract following the expiration of the express franchise agreement.  Virginia law recognizes that "[i]n the absence of an express contract between the parties governing a particular subject matter, an implied contract may exist."  *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 772 S.E.2d 290, 295 (Va. 2015) (citing *County of*

18

*Campbell v. Howard*, 112 S.E. 876, 886 (Va. 1922); *Ellis & Myers Lumber Co. v. Hubbard*, 96 S.E. 754, 760 (Va. 1918)).  The formal requirements for forming an implied-in-fact contract are little different than those for forming an express contract: "an implied-in-fact contract is created only when the typical requirements to form a contract are present, such as consideration and mutuality of assent."  *Id.*  The vital difference is that "an implied-in-fact contract 'is arrived at by a consideration of [the parties'] *acts and conduct*,'" rather than the words of an oral or written agreement.  *Id.* (quoting *City of Norfolk v. Norfolk Cnty.*, 91 S.E. 820, 821 (Va. 1917)) (emphasis added).

Under Virginia law, where a prior express contract between two parties expires and the parties continue to deal with one another, their dealings may give rise to an implied-in-fact contract.  An implied-in-fact contract under these circumstances may or may not have the same terms as the prior express agreement: "[I]t is only when the parties to an express contract continue to act as if that contract is still operative even after it expires that the entirety of 'the material terms of the prior contract . . . survive intact' by way of a subsequently formed implied-in-fact contract."  *Id.* at 295-96 (citing *Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery & Tobacco Workers' Int'l Union*, 28 F.3d 347, 355-56 (3d Cir. 1994)).

The Virginia Supreme Court has declined to assume that simply because a prior express agreement existed, a subsequent implied-in-fact agreement will necessarily incorporate *all* its terms.  The express agreement's full terms might survive "when the *same parties* are engaged in the *same course of dealing* both during and after the expiration of the express contract."  *Id.* at 296 (emphasis in original).  If, however, the parties' "course of dealing" is not the same, "an implied-in-fact contract may include only the particular terms of a previously expired express contract which the parties' subsequent actions, embodying their mutuality of assent, specifically encompass."  *Id.* (citing *Green's Ex'rs v. Smith*, 131 S.E. 846, 848 (Va. 1926); *City of Norfolk*, 91 S.E. at 821-22).

Defendants are right that Virginia law is clear that a court's role is "to construe the contract made by the parties, not to make a contract for them."  *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984).  But the essence of an implied-in-fact agreement is that it is an independent agreement *between the parties*—"embodying their mutuality of assent"—evinced by their actions rather than their words.  Despite this high-minded language, such things as implied-in-fact contracts are not merely judicial creatures (although they, like any contract, may require judicial interpretation), nor are they rarefied relics of the "heaven of legal concepts."  Felix S. Cohen, *Transcendental Nonsense and the Functional Approach*, 35 Colum. L. Rev. 809, 809 (1935).  On the

contrary, the pleadings support the inference that the parties themselves understood that they had continuing obligations to one another after October 31, 2017.  For example, it is alleged that Defendants did not stop paying their regular commissions to Liberty until 2019.  Defendants, in other words, do not seem to have thought that, just because their written franchise agreement had expired, they were now free to operate a Liberty franchise without giving Plaintiff anything in return.  Nor did Plaintiff immediately sue Defendants for making unauthorized use of the Liberty marks or cut off Defendants' access to the Liberty computer system on November 1, 2017.  Taken together, these facts could reflect an understanding between the parties about ongoing obligations between them, despite the expiration of their express agreement.  Plaintiff continued to lend Defendants the Liberty brand and Defendants continued to pay for it.

To be sure, the Court makes no findings here about the terms or existence of any implied-in-fact agreement between the parties—such findings will require evidence and briefing not available to the Court at this stage.  But the allegations in the First Amended Verified Complaint and the plain language of the franchise agreement make the existence of such an implied contract at least "plausible on its face."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The same goes for the possibility that an implied-in-fact agreement incorporated the post-term noncompete covenant. Defendants are correct that the covenant's conclusion is pegged to a particular date, but so are all the in-term provisions, which all parties agree were due to expire five years after the agreement was executed. Defendants have not persuaded the Court that, as a matter of law or the plain language of the franchise agreement, there is any reason to think that the post-term covenants could not be incorporated into a post-expiration implied-in-fact agreement. The question is not whether the covenant was clearly time-limited in the written franchise agreement. It is whether a subsequent implied contract—reflecting the course of dealing under the written agreement but formally separate from it—might have incorporated the noncompete provision.[7]

---

[7] It might also be said that the language about the timing of the post-term covenant is not as clear as Defendants suggest. It refers to "a period of two (2) years following the termination, expiration, transfer or other disposition of the *Franchised Business*," not the termination of the "Agreement." (Doc. 29-1 at 16) (emphasis added). These terms are not used interchangeably throughout the contract. Still, it is true that the language of the noncompete provision is not nearly as clear as that used by some other franchisors, such as that quoted by Defendants. *See Smoothie King Franchises, Inc. v. Southside Smoothie & Nutrition Ctr., Inc.*, No. CIV. A. 11-2002, 2012 WL 1698365, at *14 (E.D. La. May 15, 2012), *aff'd*, 515 F. App'x 362 (5th Cir. 2013).

For these reasons. the Court cannot conclude that Plaintiff has failed to state facts giving rise to a plausible claim to injunctive relief under the noncompete provision.

### ii.    Breach of Contract Claims as to Pierce and Axley

Defendants also advance the separate theory that breach of contract claims cannot be brought against Pierce and Axley as individuals because they were removed as signatories to the franchise agreement in 2013.  (Doc. 31 at 9-10).  It is undisputed that in a 2013 amendment to the agreement, Pierce and Axley "were removed as the franchisees . . . and LNPA Services was replaced as franchisee," with Pierce and Axley remaining on the contract as guarantors. (Doc. 31 at 9-10; Doc. 32 at 16.)  The parties do dispute, however, what the continuing obligations of Pierce and Axley were under the amendment and the original agreement.

At this stage, Plaintiff has alleged a plausible claim for breach against Pierce and Axley under the 12(b)(6) standard.  The U.S. District Court for the Eastern District of Virginia, applying Virginia law to similar franchise agreements, has twice rejected motions to dismiss predicated on arguments similar to the one Defendants press here.  *See JTH Tax, Inc. v. Frashier*, No. 2:09-cv-40, 2009 WL 10689306, at *2 (E.D. Va. Apr. 15, 2009); *JTH Tax, Inc. v. Fein*, No. 2:08-cv-21, at *10 (E.D. Va. Dec. 22, 2008).  In both cases, the district

court held that the individual defendant's signature of a "personal guaranty" in the franchise agreement was sufficient to establish a potential basis for individual liability. *See id.*

Defendants have not made any showing that would lead the Court to depart from these holdings. In fact, they offer a somewhat strained interpretation of the franchise agreement on this point. Pierce and Axley signed the amendment for LNPA Services "individually and as Managing Member[s]" of the LLC. (Doc. 29-2 at 2.) The franchise agreement assigns obligations to "you," defined as "the Franchisee and all Signators identified on the signature page to this Agreement." (Doc. 29-1 at 5.) This language would be superfluous if "Franchisee" and "Signator" were construed as identical terms. *See Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984) ("[C]ourts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein."). It is thus certainly plausible that, as Plaintiff urges, the effect of the amendment was not Pierce and Axley's "removal as Signator[s]," but simply—in the plain language of the amendment—the reassignment of the "name and ownership type of the franchise" from the partnership of Pierce and Axley to LNPA Services LLC. (*See* Doc. 29-1 at 16; 29-2 at 2.)

Nor is it true, as Defendants argue, that Plaintiff's reading of the agreement would render meaningless the "removal as Signator" language in the noncompete provision. (*See* Doc. 33.) All Plaintiff's interpretation entails is that Pierce and Axley could not escape their status as "signators" by assigning their ownership interest to a corporate form they controlled and remaining the only two individuals whose signatures are on the agreement. The Court therefore cannot dismiss Plaintiff's claims for breach against Pierce and Axley on this basis.[8]

### c. Conversion

Defendants argue that Plaintiff's claim for conversion is barred by Georgia's four-year statute of limitations because Plaintiff's right to sue accrued when the express Franchise Agreement expired on October 31, 2017. (*See* Doc. 31 at 10-11.)  This argument depends on Defendants' broad theory that the parties' contractual relationship ended on that date.  Because the Court rejects the idea that the pleading fails to allege a factual basis for an

---

[8] Neither in this nor the previous section does the Court reach any conclusions about the correct interpretation of the franchise agreement, the 2013 amendment, or any subsequent implied agreement between the parties.  Its discussion here is exclusively intended to address whether Plaintiff's claims are based on factual allegations that make their construction of the parties' obligations so unlikely that the Complaint "fail[s] to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

ongoing contractual relationship after the expiration of the express contract, *see supra* Part IV(b), the Court finds that Plaintiff has plausibly alleged that its right of action for conversion accrued in 2019 or 2020.  For this reason, the Court must deny the motion to dismiss as to the conversion claim.

### d. Tortious Interference With a Contract

Finally, Defendants argue that Plaintiff fails to state a claim for tortious interference with a contract because it does not "plead sufficient facts to establish that defendant[s Nest Financial and AX Holdings were] . . . stranger[s]" to the franchise agreement.  (Doc. 31 at 11.)  Plaintiff responds that "AX Holdings and Nest Financial were not parties to the Franchise Agreement" and are "separate corporate entities who could have established their business anywhere."  (Doc. 32 at 18.)  Instead of doing so, "they induced LNPA Services/Pierce/Axley" to violate the terms of their Franchise Agreement."  (Doc. 32 at 18.)

In Georgia, "it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 282 (Ga. 1998).  "One is not a stranger to the contract just because one is not a party to the contract." *Id.*  Instead, "for a defendant to be liable for tortious interference

with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Id.* at 283. In *Atlanta Market*, the Supreme Court of Georgia expressly endorsed an approach to the "stranger doctrine" that "reduce[d] the number of entities against which a claim of tortious interference with contract may be maintained." *Id.* This Court has applied *Atlanta Market* to hold, "as a matter of law[,] that a parent corporation cannot be a stranger to its subsidiaries' business or contractual relations, and that no claim can be sustained against a parent for tortious interference with such relations." *Perry v. Unum Life Ins. Co. of Am.*, 353 F. Supp. 2d 1237, 1241 (N.D. Ga. 2005) (citing *In re Hercules Auto. Prods.*, 245 B.R. 903, 910 (Bankr. M.D. Ga. 1999)) (quotation omitted). This rule squarely forecloses any tortious interference claim against AX Holdings Inc., which is alleged to be the sole member of both LNPA Services LLC and Nest Financial Services LLC. (Doc. 29 at 2.) As the parent of LNPA Services, AX Holdings was not a stranger to the franchise agreement.

The holding regarding parent entities was, however, not extended to "sibling" entities, which is a more accurate description of the relationship between LNPA Services and Nest Financial Services, both of which are subsidiaries of AX Holdings. *See In re Hercules Auto. Prods., Inc.,* 245 B.R. 903

(Bankr. M.D. Ga. 1999) (noting that "[t]he *Atlanta Mkt. Ctr.* holding bars claims against parents for tortious interference with their subsidiaries' relations, but the court articulated no such principle barring tortious interference claims brought against siblings").

Whether Nest Financial Services LLC was a stranger to the franchise agreement thus presents a closer question.  On the one hand, although Nest Financial is alleged to be owned by AX Holdings and controlled solely by Pierce and Axley, this would in itself not seem to bar it from being a "stranger" to the franchise agreement under Georgia law.  The cases cited above are concerned that defendants not be held liable for tortious interference with respect to agreements to which they are not parties, but which form part of a broader "interwoven contractual arrangement" of which they *are* a part.  *Atlanta Mkt. Ctr.*, 503 S.E.2d at 283-84.  The facts alleged do not show that Nest Financial Services was part of any such arrangement involving Plaintiff and the other defendants.  On the contrary, Nest Financial Services' creation appears to have been a byproduct of the *breakdown* of the franchise relationship between Pierce, Axley, LNPA Services, and Plaintiff.  Nor do any allegations support the inference that Nest Financial Services as such had "an economic interest in the contract or business relationship" between Pierce, Axley, LNPA Services, and Plaintiff.  On the other hand, a fair argument could be made that

28

while common ownership does not preclude tortious interference claims, *see Hercules Auto. Prods.*, 245 B.R. at 910, a perfect commonality of control—which Nest Financial Services and LNPA Services share—must necessarily mean that two entities cannot be strangers to one another's "business relationship[s]."

Ultimately, the Court need not resolve this question.  For the pleading fails to state a viable claim for tortious interference against Nest Financial Services on other grounds.  In Georgia, "[t]ortious interference claims, whether asserting interference with contractual relations [or] business relations, . . . share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or their parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Gordon Document Prods., Inc. v. Serv. Techs., Inc.*, 708 S.E.2d 48, 53 (Ga. Ct. App. 2011).  Plaintiff has not alleged any facts that make it plausible that Pierce or Axley, in their capacities as officers of Nest Financial Services, "induced" themselves, in their individual capacities or as officers of

LNPA Services, to breach their obligations to Liberty. The proposition's strangeness testifies to its unlikelihood.

Furthermore, the allegations themselves cut in the other direction. Nest Financial Services LLC was formed on October 17, 2019.[9] This is only about three months before Plaintiff sent its "notice to cure default" letters to Defendants and seven months before Plaintiff claims to have terminated the agreement. If indeed Pierce, Axley, and/or LNPA Services breached an agreement with Plaintiff by competing with them, by far the most natural account of the facts would be that Pierce and Axley breached the agreement by creating Nest Financial Services in order to run a competing tax preparation business. In other words, the well pled allegations support the inference that Pierce and Axley (as individuals or agents of LNPA Services) were not "induced" to commit any breach but decided to do so on their own—and only then created Nest Financial Services.

The tortious interference claim, in this case, would be viable only if the causation in this story were turned on its head. The allegations would have to support the conclusion that Nest Financial Services LLC "induced" and

---

[9] The Court takes judicial notice of this fact, which is a matter of public record. *See Se. Clinical Nutrition Centers, Inc. v. Mayo Found. for Med. Educ. & Rsch.*, 135 F. Supp. 3d 1267, 1271 (N.D. Ga. 2013) ("The Court may also take judicial notice of matters of public record.").

"proximately caused" the alleged breach.  *See Gordon Document Prods., Inc.*, 708 S.E.2d at 53.  But the LLC's creation in October 2017 much more strongly supports the inference that Pierce and Axley already intended to set up their competing business before Nest Financial Services LLC ever existed.  The well pled factual allegations in the Complaint provide no basis for rejecting this "obvious alternative explanation" of Nest Financial Services' role in any breach of the franchise agreement.  *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).  Nor do any factual allegations support the pleading's conclusory statement that Nest Financial Services "induced" a breach.  *See, e.g., AWP, Inc. v. Henry*, No. 1:20-CV-1625-SDG, 2020 WL 6876299, at *8 (N.D. Ga. Oct. 28, 2020) (dismissing tortious interference with contract claim where plaintiff "simply alleges the [defendants] 'induced' and 'worked with' [third party] to breach his contract").  The Court will therefore dismiss the tortious interference claim.

## V.     Conclusion

For the foregoing reasons, Defendants' Emergency Motion to Dismiss (Doc. 14) is **DENIED AS MOOT**, and their Partial Motion to Dismiss (Doc. 31) is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted with respect to Plaintiff's claim for tortious interference with a contract against AX Holdings Inc. and Nest Financial Services LLC, which is dismissed with prejudice.  The motion is denied with respect to all other claims.

**SO ORDERED** this 8th day of September, 2022.

SARAH E. GERAGHTY
United States District Judge